

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

October 8, 1958

Hon. William M. King
State Securities Commissioner
Austin, Texas

Opinion No. WW-504

Re: Whether the proposed offer of
common stock to holders of sur-
plus debentures under the facts
given is an exempt transaction
under the provisions of either
5(D) or 5(F) of The Securities
Act.

Dear Sir:

You have asked the opinion of this office concerning whether
a certain offering of the Citizens Standard Life Insurance Company of
Corpus Christi, Texas, of common stock to its "advisory board investment
certificate holders" is exempted from the provisions of The Securities
Act. Your letter is as follows:

"In May, 1954, Citizens Standard Life Insurance Com-
pany, Corpus Christi, Texas, authorized the issuance at
public sale of 3,000 ADVISORY BOARD INVESTMENT CERTIFI-
CATES, of the face value of $600.00 each. By December 31,
1954, subscriptions for 1449 Certificates had been taken
on which $238,590.00 in payments had been made. A time
pay-out plan was offered subscribers.

"The purpose of this offering was to raise surplus
funds for expanding the life insurance business of the
company, and all net receipts have been in the past cred-
ited to its unassigned surplus account. The company's
obligation on the Certificates is not recognized or re-
ported as a statement liability in the annual reports to
the State Board of Insurance.

"The original terms are set forth in the attached
copy of a Certificate. The original offer of the Cer-
tificates to the public was made prior to the effective
date of the Insurance Securities Act; therefore, the of-
fering was not subject to registration with a State
agency.

"On September 17, 1957, over signature of the com-
pany's secretary, and on September 30, 1957, over the
signature of the company's president, offers to exchange
stock of the company for certificates outstanding were

made under terms that were different from the terms provided in the certificates. Copies of these two letters are attached. No application for registration of securities has been filed.

"In your examination of these letters it will be noted that an offer is made by the company to exchange subscription contracts for the purchase of stock for subscription contracts for the purchase of Advisory Board Certificates in addition to an offer to exchange stock shares for paid-up certificates.

"The Securities Act sets out in Section 7.A.that securities must be registered thereunder if sold or offered unless otherwise registered under Section 7.B., or Section 7.C., or unless such securities are defined by Section 5. as exempt transactions or by Section 6. as exempt securities. The Securities Act in Section 4.A. defines a security and in Section 4.E. defines the term 'sale' or 'offer for sale'.

"Under the facts as given above, is the exchange offer made in the attached letters subject to registration under the Securities Act, unless exempt under Section 5.F.?

"Section 5.F. of the Securities Act sets out as an exempt transaction the issuance of securities by a company to its securities holders, or creditors, when made in good faith in the process of a bona fide reorganization. In your opinion would an amendment to a corporation's charter changing its capital stock from par value to non par value, and increasing the number of shares, joined with the stockholders' decision to exchange common stock for surplus debentures, altering the terms thereof, constitute a readjustment of capital structure or a serious overhauling by legal procedures to bring such change within the meaning of a bona fide reorganization as used in Section 5.F.?

"Your consideration of these matters will be greatly appreciated."

The Citizens Standard Life Insurance Company issued approximately 3,000 of its so-called "advisory board investment certificates," each having a $600 face or maturity value. The certificates were issued either for cash or upon a five-year payment plan. Under the terms of the certificate, the company agreed to pay the certificate holder interest at the rate of 4% on all payments made under the certificate, with

the first year's payment of interest to be made out of contributed surplus, and thereafter out of earned surplus.  It was further provided that at the end of the first full calendar year after the date of the certificate, and the end of each calendar year thereafter until maturity, the company would create an "annual bonus fund" for the benefit of the registered certificate holders out of the profits and/or earned surplus of the company, which it would divide into 3,000 equal parts; and so long as a certificate was in force, one such part would be paid to each owner of the certificate.  The amount of the annual bonus fund was to be 2% of the renewal life insurance premiums paid during the year to the company on all life insurance policies, plus 1% of the "excess interest earnings on all investments" of the company.  The company was required to continue the payments into the annual bonus fund until the maturity of the certificate or until the certificate had been called in the manner provided in the contract.

In addition to the annual bonus fund provided, the company also agreed to set up on its books a "special surplus fund account" and agreed to credit to that account at the end of each calendar year after the date of the certificate a sum equal to 33-1/3% of its net surplus earnings for each year.  It was provided that the certificate should mature and the face value thereof paid to the registered owner within 60 days after the amount accumulated in said "special surplus fund account" should be equal to the aggregate of the total face value of all outstanding advisory board investment certificates and the accumulated interest, if any.

At such maturity the company agreed to pay to the registered owner the face value of $600.00 plus interest and further "within the limits of its presently existing legal contractual powers, to permit the owner of this certificate, if he so elects, in lieu of acceptance of payment of the face value in cash, to convert the face value of this certificate into the company's common stock at the stipulated price of $100 per share."

Under the terms in the certificate under the heading "Guaranteed Surrender Value," the certificate holder could discontinue payment and could receive a "modified certificate" which in effect was a pro rata advisory board certificate, less certain liquidated damage charges giving the certificate holder the right to participate on a pro rata basis in all the benefits except the annual bonus fund.

Under the heading "Miscellaneous," it was provided that any moneys paid for the investment certificate should be treated as paid-in surplus and that the company could make use of such funds in any way that surplus funds of the company might be lawfully used.  It was further provided that all interest was payable only as therein set forth, and that the investment certificate, together with the interest thereon, should not be a liability of the company or a claim against any of its

assets except as above specified in the paragraph. And in seemingly conflicting terms, it was further provided that in the event of liquidation of the company the investment certificate should immediately mature and become a present liability of the company subject to the rights of the policyholder.

These certificates have not yet matured. It is the purpose of the Citizens Standard Life Insurance Company to offer to each holder of an advisory board investment certificate 60 shares of its common stock in exchange for a surrender of such certificate plus a bonus of 6 shares to each certificate holder completing his payments by a date specified which would be in advance of the dates specified in the certificate. It should be noted that under the terms of the certificate the company had agreed that at maturity the face value should be payable in cash or stock of the company at the election of the certificate holder. Thus, under the terms of the certificate at maturity, each certificate holder of a full $600.00 certificate would have been entitled to elect to receive six shares of stock. Since the issuance of these certificates the corporate structure of the Citizens Standard Life Insurance Company has been changed resulting in a ten-for-one split.

Prior to the charter amendment creating the stock here in question, the company had issued stock to other certificate holders who had paid in full the amount of their certificate. The general plan of the company has been to obtain charter amendments increasing their capital stock periodically to accommodate these certificate holders.

The Securities Act states that securities as defined therein must be registered under Section 7 if sold or offered for sale unless the sale or offer of sale of such securities constitute "exempt transactions" as defined by Section 5, or such securities are "exempt securities" as defined by Section 6. The term "sale" and related terms are defined in great detail in Section 4(E) and it is only necessary to refer to a portion of this definition to ascertain that the contemplated exchange in this case would constitute a sale or offer to sell of securities requiring registration unless exempted. Section 4(E) is as follows:

"The terms 'sale' or 'offer for sale' or 'sell' shall include every disposition, or attempt to dispose of a security for a value. The term 'sale' means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property, or other things of value, or any transfer or agreement to transfer, in trust or otherwise . . . The sale of a security under conditions which entitle the purchaser . . . to exchange the same for, or to purchase some other security, shall not be deemed a sale or offer for sale of such other security; but no exchange for or sale of such other security shall ever be made unless and until the sale thereof shall have been first authorized in Texas under this act, if not exempt hereunder, or by other provisions of law. . ."

Clearly, the consummation of the prospective plan would fall within this definition.

You have requested in your letter the opinion of this office whether or not the transaction in question is exempt from registration under the provisions of The Securities Act. It has been suggested that the transaction may be exempt either under the provisions of 5(D)(E)(G) exempting certain distributions by a corporation of securities directly to its stockholders, or the provisions of 5(F) relating to transfers in the course of reorganization. We shall take up the exemption under 5(D)(E)(G) first.

Section 5 of The Securities Act is, in part, as follows:

"Section 5. Exempt Transactions.

"Except as hereinafter in this Act specifically provided, the provisions of this act shall not apply to the sale of any security when made in any of the following transactions and under any of the following conditions, and the company or person engaged therein shall not be deemed a dealer within the meaning of this act; that is to say, the provisions of this act shall not apply to any sale, offer for sale, solicitation, subscription, dealing in or delivery of any security under any of the following transactions or conditions:

". . .

"D. The distribution by a corporation of securities direct to its stockholders as a stock dividend or other distribution paid out of earnings or surplus.

"E. The sale of an increase of capital stock of a corporation only to its stockholders and without payment of any commission or expense to any officer, employee, broker or agent;

". . .

"G. The transfer or exchange by, or on account of, one corporation to another or to its stockholders of their or its own securities in connection with a proposed consolidation or merger of such corporation or in connection with the change of par value stock to non par value stock or vice versa, or the exchange of outstanding shares for a greater or smaller number of shares, provided that in such case such stockholders do not pay or give or promise and are not obligated to pay or give

any consideration for the securities so transferred or
exchanged other than the securities of said corporation
then held by them; . . ."

These exemptions apply only to "stockholders" of the corporation.

The contention has been advanced that because under the terms
of the so-called advisory board investment certificates, the holders
of the certificates, after completing the terms of their agreement and
after maturity, are given the right to require the company to redeem
the certificate in common stock rather than in cash, they should be clas-
sified as stockholders. However, under the facts recited, the certifi-
cates in question have not matured and there is not at this time under
the terms of the contract any existing right on the part of the certifi-
cate holders to require the redemption of these certificates, either in
cash or in stock. While it may be true that in some circumstances and
under certain conditions persons holding by right of contract or other-
wise a right to become a stockholder may exercise under certain condi-
tions some of the rights and prerogatives of a stockholder, the certifi-
cate holders do not fall within the normal definition of the term "stock-
holders." We hold that the transaction is not exempt under Sections
5(D), 5(E) or 5(G).

We next consider whether the transaction in question qualifies
as an exemption as the issue of securities in the course of a reorgani-
zation under the provisions of Section 5(F) which is as follows:

"F. The issue in good faith of securities by a com-
pany to its security holders, or creditors, in the process
of a bona fide reorganization of the company made in good
faith, . . . provided that . . . such securities are issued
in exchange for securities of such holders or claims of
such creditors, or both, and . . . security holders or cred-
itors do not pay or give or promise and are not obligated to
pay or give any consideration for securities so issued other
than the securities of or claims against said company . . .
then held or owned by them."

The term "reorganization" is not defined in the statute. Nor
do we find any cases in Texas interpreting the meaning of this exemption
though it has been in effect in substantially the same language in the
Securities Acts since 1935. Nor have we been able to find any Texas
cases dealing with the meaning of this term which would have a signifi-
cance to its present application. The term "reorganization" has been
defined by Texas Jurisprudence in Volume 10-B, page 676, as follows:

"A 'reorganization' has been termed a plan under which
the financial structure of the corporation was rearranged,
as by an increase or decrease of capital."

This definition of the term "reorganization" is so broad that it would include every transaction whereby the capital stock of a corporation was increased or decreased. While it is true that almost every "reorganization" will effect a change in the financial structure of the corporation, it is not true that every change in the financial structure is a "reorganization."

We find that the above quoted from Texas Jurisprudence is not supported by the cases cited therein.

At 15 Fletcher's Cyclopedia Corporations, Section 201, page 318 (1938 revised volume), it is demonstrated that the term "reorganization" has many meanings.

"The term 'reorganization' signifies the act or process of organizing anew. As applied to corporations, it denotes various proceedings and transactions by which a succession of corporations is brought about. Ordinarily it involves the creation of a new corporation to take over the assets and property and continue the business of the old. This, however, is not necessarily the effect of a reorganization. The terms of the statute and the intention of the Legislature and of the parties may be merely to continue the existing corporation, without dissolution, under the same or different name and with the same or different powers, and under the same or a different management. According to Mr. Morawetz, the term 'reorganization' is 'commonly applied to the formation of a new corporation by the creditors and shareholders of a corporation which is in financial difficulties, for the purpose of purchasing the company's works and other property after the foreclosure of a mortgage or judicial sale'.

"It is proper to classify reorganizations as (1) reorganizations in connection with the foreclosure of corporate mortgages, or in connection with other judicial or execution sales of the corporate property by the purchasers at the sale, and (2) other reorganizations or reincorporations. The latter class is divisible into (a) reincorporations where the purpose is merely to correct illegalities or defects in the original incorporation, or to broaden the scope of the powers of the corporation, including, in one sense of the word, the amendment as well as the extension or revival of charters; (b) the scaling of securities by voluntary agreement; and (c) the organization, primarily by or on behalf of the stockholders as distinguished from the creditors, of a new corporation, without any forced sale, to take over the property of the existing corporation. The term is used most often in connection with the foreclosure

of corporate mortgages where a new corporation is formed by the foreclosure purchases, and most of the law, as laid down in the decision, in connection with reorganizations, relates to the first class of reorganization, and much of such law is not applicable to other reorganizations.

"The reasons inducing a reorganization are not in every case the same, but for the most part they are to be found in the weak financial or insolvent condition of the particular corporation. And so the aim of a corporate reorganization is generally to put the company upon a sound financial basis, and to enable it to take care of its obligations, thereby avoiding liquidation or bankruptcy. But in some cases a reorganization is effected, notwithstanding the corporation is solvent. Very often a 'sound enterprise, earning an adequate return, will be hampered by an unsound financial structure involving excessive fixed charges, such as bond interest; or again the difficulty of refunding a material bonded indebtedness during a time of financial stringency, or the urgent need of additional capital for improvements, or the weight of an unfunded debt will make a reorganization necessary.'

"The reorganization of an insolvent business involves considerations not present in the reorganization of a solvent one. Almost always the latter is a matter of purely business policy not intended to nor resulting in disturbance of existing legal rights of creditors or stockholders. It is carried through in strict conformity with such rights, the purpose being to better an existing condition. The former is compelled by the inexorable logic of a bad situation, is designed to save as much as possible from impending wreckage, and always involves changes in the existing legal rights of some, if not all, of those having rights in connection with the property involved."

Our attention is called to the case of Utility Investing Corporation v. Stewart, 11 Fed. Supp. 391 by the Federal District Court in Pennsylvania, which opinion was affirmed in Stewart v. Utility Investing Corporation (C.C.A. 3rd) 78 Fed.2d 279. This case is apparently the only one interpreting the meaning of the term "reorganization" in the context of the State Securities Act. The Pennsylvania Securities Act provided that:

"The issue of securities to the security holders or other creditors of a corporation, in the process of a bona fide reorganization of such corporation, made in good faith . . . in exchange for the securities . . . of such creditors . . . [should not constitute the person or company engaged therein a dealer within its meaning]."

Under the facts involved in the case, the corporation in question was offering to debenture holders of that company certain new or different securities in exchange for their debentures. It was the purpose of the company to relieve itself of the burden of having to meet fixed interest charges at definite periods by inviting the holders of fixed interest debentures to exchange them for new obligations at a high rate of interest, cumulative, but payable only as earned and coupled with a sinking fund provision. The holders were also offered two options, the exercise of either of which was described by the court as having the effect of naturally lightening the fixed interest burden upon the equities of the holding company. The court stated:

"I entertain no doubt that this rearrangement of its capital structure is a reorganization of the company within the meaning of the act. While corporate reorganizations are frequently, in fact usually, effective through the medium of receivership and judicial sale, the ordinary meaning of the word is quite broad enough to include voluntary capital readjustments. Nor is it necessary that there be a new corporation or change of management or ownership of physical assets. Nor need the equities be affected (though in this case they are). That the act contemplates, among others, reorganizations entirely confined to the credit structure appears from the fact that the provision in question may be read as applicable to 'issue of securities to the . . . creditors . . . in exchange for the . . . claims of such creditors.' 70 P.S. Pa. Sec. 2(c) and (11).

"The underlying purpose of this and similar statutes is to protect the investing public. The method by which the Pennsylvania Act does it is the licensing of dealers. Exceptions from the operation of the law are created by excluding from the class of dealers persons engaged in certain specified transactions, one of which is the offer of securities in the course of corporate reorganizations. The only condition is that the reorganization be bona fide and the offer of securities made in good faith."

This decision recognizes that whether a given transaction is a reorganization depends upon the particular facts involved. Though recognizing certain similarities, we believe the fact situation involved in your request differs from those in this decision so that it would not control even though it be the law in Texas.

In connection with this transaction the Citizens Standard Life Insurance Company has made application to the Commissioner of Insurance for approval to amend their charter to permit the increase of their capital in order to transfer the stock to their so-called certificate holders. We call attention to certain testimony taken by the Commission on February

25, 1958, in connection with said application. On page 13 of this transcript Mr. Preston Doughty, President of the Citizens Standard Life Insurance Company, explained the purpose of the amendment in the following language:

> "In fact, the program of getting these . . . this charter amendment was motivated by constant requests from the advisory board, of certificate holders that they be permitted to surrender their certificate and be issued stock. The stock of the company, on a local market, has a very good, high demand."

On this same subject matter Mr. Doughty stated on page 14:

> "Many of these certificate owners, having completed their payments, continuously requested of us that they be issued stock."

Again, on page 15 Mr. Doughty stated:

> ". . . We felt, and the holders of the certificates felt, too, that their position would be improved if they could be permitted to become stockholders."

The nature of the transaction is further discussed by Mr. Doughty on page 15 when he was asked whether the certificate holders were surrendering their certificates and taking out stock under the option called for in the certificate, and Mr. Doughty replied that they were not obtaining their certificates under the option but in addition to the option, and further stated in response to a question as to whether or not the exchange was made on the same basis of the option, as follows:

> "Altered only by the fact that the stock--the ten shares of no par stock had been authorized and issued for each share previously issued and authorized par stock and giving them full . . ."

He affirmed that the certificate holders were getting 60 shares of no-par stock in exchange for the certificate and that the company was giving the certificate holders the opportunity of obtaining six additional shares if they had previously paid in full or would now pay in full the amount of their certificate.

Mr. Doughty further stated on page 16 that a subsequent offer to the certificate holders was made purely on the basis of the certificate holders' options contained in the certificate.

Again, on page 20 Mr. Doughty, in explaining the purpose of the charter amendment, stated:

"In order to be of assistance to them and at the same time the company, to relieve the company of the burden of paying them interest and paying them this participation in the bonus pool, the stockholders, the directors, and the officers of the company felt that we should do both these things, go to no-par stock and at the same time offer these people the opportunity to become shareholders."

We are of the opinion that under the facts surrounding the issuance of the stock in question that the transaction does not constitute a reorganization as that term is used in Section 5(F) for the reason that the principal purpose of the distribution appears to be the honoring of contractual commitments made by the company to its certificate holders to allow them the privilege of becoming stockholders. None of the ordinary or usual elements giving rise to a need for the organization appears to be predominant. There are no facts to indicate that the transaction is motivated by the financial distress of the corporation, nor does it appear that the primary motive is the lessening of the financial burden of the company because of its obligations to the holders of the certificates. It should be noted that in the ordinary circumstances one of the primary purposes of reorganization is the protection of the equity of the present stockholders. That this purpose is not entirely the purpose of the present transaction is evidenced by the fact that the offer of the company to certificate holders who have not paid in full the amount of their certificate is not simply an offer of stock equal to the present value of their certificate but rather under the plan advanced by the company the company has offered these people the opportunity to exchange their advisory board certificates for subscription contracts. Clearly, from this point of view the transaction in question does not constitute a reorganization under the terms of Section 5(F). The holders of the advisory board certificates that are not fully paid are only security holders or creditors of the company to the extent that they have paid on their certificate. Particular note must be given of the qualifying clause to Section 5(F) which provides that before the exchange in reorganization may be exempt, it must be a transaction in which the "security holders or creditors do not pay or give or promise and are not obligated to pay or give any consideration for the securities so issued other than the securities of or claims against said company . . . then held or owned by them."

The certificate holders who have not fully paid for their certificates by accepting subscription contracts would be bound to pay further consideration for the stock of the company other than the simple surrender of the certificate that they held.

We are of the opinion also that the transaction in question does not qualify as an exempt transaction under Section 5(F) for the additional reason that some of the stock to be issued is in the form of a bonus for early payment or prior payment of the face amount of

their certificates. Clearly, such certificate holders have given consideration in the form of early or prior payment which is in addition to and in excess of the simple surrender of the certificate which they hold.

In the course of this opinion we have of necessity made certain factual conclusions based on the material which you have furnished this office and from the material collected by the State Board of Insurance in connection with the charter amendment application of the company. The fact finding authority under The Securities Act rests with you and you are at liberty to arrive at different factual conclusions from those utilized in this opinion.

## SUMMARY

Issuance of stock to holders of advisory board certificates under circumstances in question is not exempt from registration either under the provisions of Section 5(D), 5(E), 5(F) or 5(G) of The Securities Act of 1957.

Yours very truly,

WILL WILSON
Attorney General of Texas

By *Fred B. Werkenthin*

Fred B. Werkenthin
Assistant

FBW:lm

APPROVED:

OPINION COMMITTEE:

Geo. P. Blackburn, Chairman

John Reeves
Morgan Nesbitt

REVIEWED FOR THE ATTORNEY GENERAL
BY
    Riley Eugene Fletcher